IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES E. GALE, SR., et al.        :

                                  :

        v.                        :   Civil Action No. DKC 20-1289

                                  :

SELECT PORTFOLIO SERVICING, INC.,
et al.                            :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this mortgage fraud case is the motion to dismiss filed by Defendants Select Portfolio Servicing, Inc. and U.S. Bank, National Association. (ECF No. 9).   The issues have been briefed, and the court now rules, no hearing being deemed necessary.   Local Rule 105.6.   For the following reasons, the motion to dismiss will be granted, albeit with leave to amend in part.

**I.   Background**

Unless otherwise noted, the facts outlined here are set forth in the complaint and construed in the light most favorable to Plaintiffs.   Plaintiffs James E. Gale, Sr. and Terri L. Gale (collectively "The Gales") are residents of Charles County, Maryland.   On October 8, 2004, the Gales secured a home mortgage loan in the amount of $310,000 ("the Loan") memorialized in a promissory note ("the Note") with a "Mortgage One Corp," they claim, as lender.   They contend that, on the same day, the "note was later sold, transferred, assigned, and securitized into the

HSBC Mortgage Services, Inc. CIM Trust 2016-1."  A copy of the Note and recorded Deed of Trust ("the DOT"), however, signed and initialed by both Plaintiffs, each clearly shows "HSBC MORTGAGE SERVICES, INC. f/k/a HFSI" as the "Lender" on their respective first page of terms.[1]

Plaintiffs allege that there was a subsequent assignment of the DOT recorded in Charles County on July 25, 2016.  Defendants do not dispute that on or around that day the DOT was assigned to a "DLJ Mortgage Capital, Inc." They assert that this was the first assignment and was properly recorded and available in the public record as shown in an attachment.  (ECF No. 9-6).  Defendants assert that, on December 6, 2019, the DOT was assigned a second time to Defendant U.S. Bank, National Association as indenture trustee, for the CIM Trust 2016-1, Mortgage-Backed Notes, Series 2016-1, ("U.S. Bank"), which was also duly recorded.  (ECF No. 9-7).  On January 21, 2020, Defendant Select Portfolio Services

---

[1] The Note was provided by Defendants and was not attached to Plaintiffs' complaint.  It can be considered, however, on a motion to dismiss as it is "integral" to the complaint, as Defendants rightly point out.  (ECF No. 9-1, at 4 n.5) (citing *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)).  Because Plaintiffs have failed to respond to the motion at all, moreover, "there is no dispute about the document's authenticity."  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing, among others, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (explaining a document is "integral" when "the complaint relies heavily upon its terms and effect") (internal quotation marks omitted)).  The DOT, attached by both parties, shows that Mortgage One Corporation is listed as Trustee and not the Lender.  (ECF No. 9-5, "DEFINITIONS," (D)).

("SPS"), acting as attorney-in-fact for U.S. Bank, executed an "Appointment of Substitute Trustee" to exercise its purported right as a beneficiary to appoint new trustees: Diane S. Rosenberg, Mark D. Meyer, Maurice Obrien, and Cristian Mendoza (collectively the "Substitute Trustees"), to replace Mortgage One Corporation as trustee for the DOT. (ECF No. 9-8); (*see* ECF No. 9-5, ¶ 24).

As outlined by Mrs. Gale,[2] since 2002, Mr. Gale has suffered from the time "when a miss-step caused 4 discs to bulge." Mrs. Gale reports that they have "fought to pay bills" ever since, as he has subsequently had two strokes, three heart attacks, two pacemakers/defibrillators and "at least" three "near death experiences" with pneumonia. In February 2019, he developed sepsis from pneumonia and went into shock, sending him to the ICU for fourteen days. There, two "inoperable masses" were found in his right lung. He has been confined to his house, too weak to leave, since then. On October 6, 2019, he broke his leg in multiple places after another misstep which, after further bouts with sepsis, has required four surgeries. Moreover, the antibiotics prescribed to fight this infection caused him kidney failure. He is, as a result, on dialysis. Ultimately, his leg was amputated.

---

[2] The complaint purports to quote an entire excerpt from "Ms. Gale's Affidavit" and refers to it as "Exhibit B," but the second attachment is a "REFINANCE AFFIDAVIT" signed on October 8, 2004, that does not contain the same statement of facts detailed here. (*Compare* ECF No. 2, ¶ 22 *with* ECF No. 2-2).

Mrs. Gale reports missing a significant amount of work to care for him.  She alleges having reached out to SPS, as the loan servicer, multiple times to report these challenges in order to seek a loan modification but was "repeatedly denied and told [her husband's] medical problems were not serious enough to warrant a loan modification."[3]

The Substitute Trustees subsequently filed with the Circuit Court for Charles County, Maryland, to "initiate[] foreclosure" on the Gales' property on March 19, 2020, and have appended the docket entry.  (ECF No. 9-9).  On April 24, 2020, in response, Plaintiffs brought a complaint against Defendants SPS and U.S. Bank[4] in the Circuit Court for Charles County, Maryland for:  1) Unjust Enrichment, 2) Violations of the Fair Credit Extension Uniformity Act ("FREUA"), 3) Violations of the Fair Debt Collection Practices Act ("FDCPA"), 4) "Reasonable reliance; detrimental reliance," 6) Slander of Title,[5] 7) Fraud in the Concealment, 8) Fraud in the

---

[3] The Gales insert a timeline of phone calls to SPS made on their behalf by a "Meriquest" with two entries on October 3, 2019, and November 25, 2019, that read, respectively, "Modification denied today because it[']s not an available option for this loan" and "File closed out again because a modification is not an option on this loan."  (ECF No. 2, ¶ 22).

[4] In their motion to dismiss, Defendants assert that the complaint misstates the proper name/role of this entity by referring to it as either "Trustee for Securitized Trust, CIM TRUST 2016-1" or "Trustee for Salomon Mortgage Laon Trust Series 2003-CB1."  (ECF No. 9, at 1); (*see* ECF No. 2, ¶¶ 4 and Caption).

[5] It is labeled "Sixth Claim for Relief," but there is no Fifth.  Defendants, however, purport to identify language prior to

Inducement, 9) Unconscionability, 10) Breach of Contract, 11) Violations of the Consumer Credit Protection Act ("CCPA"), 12) "Violations of Federal Regulations, Regulation X, 12 C.F.R. § 1024.41(b)(2)(i)(A)," and 13) Intentional and Negligent Infliction of Emotional Distress. As a "Fourteenth Claim," they also seek declaratory relief, asking for a "judicial determination of their rights, obligation and interest of the parties with regard to the subject property," and for the court to quiet title by declaring "the Subject Property is vested in Plaintiff alone." As a coda and general allegation, they also accuse Defendants of "unfair or deceptive acts or practices and misleading misrepresentatives and non-disclosure of material facts relating to their debt collection practices." (ECF No. 2).

Defendants subsequently removed the case based on diversity jurisdiction on May 22, 2020. (ECF No. 1). Defendants filed a motion to dismiss all claims on June 28, 2020 (ECF No. 9), and notice was sent to the Gales. (ECF No. 10). Despite the warning that a failure adequately to respond could result in dismissal of the complaint, Plaintiffs have failed to respond.

## II.  Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*,

---

this claim that, although unnumbered, "appear[s] to recite purported grounds for an order quieting title" and thus constitutes a separate "Count 5." (*Id.*, ¶¶ 73-83).

464 F.3d 480, 483 (4th Cir. 2006).  When evaluating the complaint, unsupported legal allegations need not be accepted.  *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

*Pro se* pleadings are to be liberally construed and held to a less stringent standard than pleadings drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Liberal construction means that the court will read the pleadings to state a valid claim to the extent that it is possible to do so from the facts available; it does not mean that the court should rewrite the complaint to include claims never

presented. *Barnett v. Hargett*, 174 F.3d 1128, 1132 (10th Cir. 1999). Even when *pro se* litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

## III. Analysis

Defendants do not dispute Mr. Gale's reported medical challenges or the fact that the Gales were denied a loan modification, but imply that such allegations constitute Plaintiffs' concession that the loan was fully enforceable: "Plaintiffs admit that Mr. Gale suffered a medical hardship, and had been denied a loan modification as recently as November 25, 2019." (ECF No. 9-1, at 5) (citing ECF No. 2, ¶ 22).

Lurking in the background of Plaintiffs' claims, as Defendants correctly point out, is an entirely discredited theory that the assignment or securitization[6] of home loans without notice

---

[6] This phrase generally refers to the institutional practice of pooling debt and selling its derivative rights (i.e. income) to investors. Both parties, however, seem to treat any assignment of the Note as a securitization, insofar as they are sales of a security interest in the property. The caselaw to which they cite, however, explicitly maintains a conceptual difference between securitization and simple sale/assignment. *See, e.g.,* *Parker v. American Brokers Conduit*, 179 F.Supp.3d. 509, 513, 517 n.11 (D.Md. 2016) (referring separately to "loan securitization and assignments [both] executed through the MERS system" and commenting that, "[s]ecurization is after all, at bottom a sophisticated mechanism for mortgage assignment"). Regardless, Plaintiffs have requested discovery to "determine the securitization parties involved" and purport to name "Does 1-100" in the complaint. (ECF No. 2, ¶¶ 6, 9). These purported Defendants are not otherwise named in the allegations, nor is their alleged

to the borrower is either illegal or renders the Note and Deed of Trust unenforceable. (ECF No. 9-1, at 8-9) (discussing ECF No. 2, ¶ 55) ("Plaintiff[s] requests that this Court find the purported power of sale contained in the Deed of Trust is a nullity by operation of law."). Among other things, Plaintiffs argue that "none of the Defendants in this case hold a perfected and secured claim in the Real Property" as the assignments were "never submitted for recordation" by MERS [Mortgage Electronic Registration Systems, Inc.] at the Secretary of State's Office where the property sits as required by the UCC and thus constitute "Secret [,unenforceable] Liens." (ECF No. 2, ¶¶ 19, 81, 87, 88).

Maryland caselaw[7] has squarely rejected similar claims of purportedly defective debt assignment or securitization. *See*

---

role in the whole affair made clear, and so their inclusion will be ignored for purposes of this motion.

[7] In federal diversity cases, a court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). For Plaintiffs' contract claims, "Maryland follows the rule of *lex loci contractus* . . . applying the substantive law of the state where the contract was formed *in the absence of a choice-of-law provision in the* contract." *AirFacts, Inc. v.* Amezaga, No. DKC 15-1489, 2020 WL 6874313, at *3 (D.Md. Nov. 23, 2020) (citing *Am. Motorists Ins. Co. v ARTRA Group, Inc.*, 338 Md. 560, 573 (1995)) (emphasis added). The DOT contains a choice-of-law provision that reads "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located." (ECF No. 9-5, ¶ 16). On the other hand, Plaintiffs' tort claims, under Maryland rules, are governed by the law of the state where the injury was suffered. *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986); *see also Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744 (2000). There is no dispute that property in question is in Maryland and

*Parker*, 179 F.Supp.3d. at 516 (rejecting a claim that the defendants could not foreclose on a property because they "'failed to perfect any security interest'" in it); *see also Suss v. JP Morgan Chase Bank, N.A.*, No. WMN-09-1627, 2010 WL 2733097, at *5 (D.Md. July 9, 2010) ("As to Plaintiff's criticism of MERS, courts . . . have found that the system of recordation is proper and assignments made through that system are valid."); *Flores v. Deutsche Bank Nat'l. Trust, Co.*, No. DKC 10-0217, 2010 WL 2719849, at *5 (D.Md. July 7, 2010) (collecting cases) (finding that "[a]ccording to the Note, the Lender may transfer the Note and subsequent lenders may appoint substitute trustee.").

U.S. Bank argues that it was validly assigned both the Note and the DOT.  (ECF No. 9-1, at 14) (citing ECF No. 9-7).  Both documents give notice that the Note might be sold.  The Note provides that "the Lender may transfer this Note.  The Lender or *anyone who takes this Note by transfer* and who is entitled to receive payments under this Note is called the 'Note Holder.'" (ECF No. 9-4, at 2).  The DOT comments in a section entitled "Sale of Note; Change of Loan Servicer; Notice of Grievance" that "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." (ECF No. 9-5, ¶ 20).  Therefore, neither the assignment

---

that Plaintiffs suffered the alleged harms there.  Therefore, Maryland law applies to all of Plaintiffs' claims.

of the Note and the DOT without notice to the Gales, nor MERS's
alleged failure properly to record these assignments at the Charles
County Recorder's Office, invalidates the enforceability of these
instruments.  (*See* ECF No. 2, ¶¶ 19, 23).

A.   **Unjust Enrichment**

Plaintiffs' claim for unjust enrichment follows a similar and
equally discredited theory.  The Gales claim that "U.S. Bank, N.A.
surrendered its right to collect by lawsuit on the obligation" as
per a purported Pooling and Servicing Agreement ("PSA").  The Court
of Appeals of Maryland has recently explained the role of such
agreements in the securitization of homebuyer debt:

> Securitization starts when a mortgage
> originator sells a mortgage and its note to a
> buyer, who is typically a subsidiary of an
> investment bank.  **The investment bank bundles
> together the multitude of mortgages it
> purchased into a "special purpose vehicle,"
> usually in the form of a trust**, and sells the
> income rights to other investors.  **A pooling
> and servicing agreement establishes two
> entities that maintain the trust: a trustee,
> who manages the loan assets, and a servicer,
> who communicates with and collects monthly
> payments from the mortgagors.**

*Blackstone v. Sharma*, 461 Md. 87, 137-38 (2018) (quoting *Anderson
v. Burson*, 424 Md. 232, 237 (2011)) (adding the emphasis).  No PSA
is appended to the complaint, nor are particular terms cited.  The
complaint only argues that "U.S. Bank, N.A. benefits were conferred
on Salomon Mortgage Loan Trust" "by way of Plaintiff's [] payments"
but "U.S. Bank, N.A. continued accepting payments."  (ECF No. 2,

¶ 26-27).  The reference to a PSA, therefore, seems to explain how Plaintiffs believe U.S. Bank securitized the debt after acquiring it via assignment (whereby U.S. Bank allegedly acted as a trustee for the purported "Salomon" trust, *see* note 4).  Moreover, it is, they believe, the agreement by which U.S. Bank purportedly surrendered its right to collect on the Loan, despite continuing to do so anyway.  (*Id.*, ¶ 28-29).  It is unclear if the Gales intend also to name SPS, except for the boilerplate statement that, "The conduct of Defendants was done willfully and in reckless disregard for the rights of Plaintiff[s]."  (ECF No. 2, ¶ 31).

Regardless, the claim is without basis.  Even accepting that such a PSA exists and governs this dispute along with the Note and the DOT, Defendants' argument that Plaintiffs "do not even allege the basic elements of unjust enrichment" need not be addressed. (ECF No. 9-1, at 11).  "Under Maryland law, a quasi-contract claim may not be brought where the subject matter of the claim is covered by an express contract between the parties."  *Hebbeler v. First Mariner Bank*, No. ELH-17-3641, 2020 WL 1033586, at *23 (D.Md. Mar. 2, 2020) (citing, among others, *FLF, Inc. v. World Publ'ns, Inc.*, 999 F.Supp. 640, 642 (D.Md. 1998) (relied on by Defendants)). Plaintiffs claim for unjust enrichment will be dismissed.[8]

---

[8] Plaintiffs will not be granted leave to amend to attempt to state a breach of contract claim, as it would be futile. Fed.R.Civ.P.15(a).  Defendants correctly argue that Plaintiffs would lack standing to enforce any PSA governing the purported pooling and sale of the income rights on the Note. (ECF No. 9-1,

**B.    FREUA**

Plaintiffs allege a violation of FREUA but that is a Pennsylvania statute.  Maryland law governs the dispute, however. This claim will be dismissed.

**C.    FDCPA**

Defendants are not debt collectors as defined under the FDCPA, so this claim will be dismissed for failure to state a claim.  The FDCPA is meant to prohibit various forms of deceptive and unfair trade practices by (often third-party) debt collectors.  *See Clark v. Absolute Collection Serv., Inc.*, 741 F.3d 487, 489-90 (4th Cir. 2014) (finding a third-party debt collector's collection notice violated the FDCPA).  Judge Bennett has explained that the act seeks only to target those who "regularly" attempt to collect debt or those whose "principal" business it is, not creditors:

> The FDCPA defines a debt collector as (1) "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" or (2) "any person...who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6); *see also Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 230 (4th Cir.

_____

at 9); *see also Parker*, 179 F.Supp.3d at 513 n.5 ("Plaintiff seems to suggest that the assignments at issue are void for violating the PSA.  Plaintiff proffers few details about this purported PSA . . . . Regardless, Plaintiff's PSA theory is one that courts have routinely rejected as meritless.  *See, e.g.*, *Bell v. Clarke*, Civ. No. TDC-15-1621, 2016 WL 1045959, at *2 (D.Md. Mar. 16, 2016)) ('[M]ortgagors generally lack standing to attack transfers of their mortgages through assignments and PSAs to which they are not parties.')").

> 2007).  A creditor, defined as "any person who
> offers or extends credit creating a debt to
> whom a debt is owed" is not a debt collector
> under the FDCPA unless an exception
> applies.  15 U.S.C. § 1692a(4); *Kennedy v.
> Lendmark Fin. Servs.*, RDB-10-02667, 2011 WL
> 4351534, at *3 (D.Md. Sept. 15, 2011) ("The
> FDCPA does not . . . apply to creditors
> collecting debts in their own names and whose
> primary business is not debt collection.")[.]

*Crowley v. JPMorgan Chase Bank, Nat'l Ass'n*, RBD-15-0607, 2015 WL
6872896, at *4 (D.Md. Nov. 9, 2015).  As such, the terms "creditor"
and "debt collector," as Defendants correctly assert, are mutually
exclusive.  (ECF No. 9-1, at 15) (citing *Howes v. Wells Fargo Bank,
N.A.*, No. ELH-14-2814, 2015 WL 5836924, at *48 (D.Md. Sept. 30,
2015)).  U.S. Bank cannot be considered a debt collector in this
action, so the FDCPA claim against it will be dismissed.

Insofar as this claim is brought against SPS, Defendants argue
SPS acted merely as a "servicer" of the loan by collecting payment
from the Gales while the loan was not in default.  The FDCPA, they
argue, specifically exempts "any person collecting or attempting
to collect any debt owed . . . to the extent such activity . . .
(iii) concerns a debt which is not in default at the time it was
obtained."  16 U.S.C. § 1692a(6)(F)(iii).  This exemption applies,
they argue, as Plaintiffs have not established that the Loan was
in default when it was "transferred to SPS for servicing (in fact,
Plaintiffs do not even identify SPS as the servicer, nor the date
when it acquired servicing rights)."  (ECF No. 9-1, at 16).

13

Plaintiffs did not file an opposition, thus failing to rebut this argument.   The failure to respond to an argument in a dispositive motion may be fatal.   *See Faller v. Faller*, No. DKC 09-0889, 2010 WL 3834874, at *6 (D.Md. Sept. 28, 2010); *see also Ferdinand-Davenport v. Child.'s* Guild, 742 F.Supp.2d 772, 777 (D.Md. 2010).   Indeed, it is here, particularly when coupled with Plaintiffs' utter failure to state allegations specific to SPS. Any purported claim against SPS under the FDCPA will be dismissed.

**D.   "Reasonable Reliance; Detrimental Reliance"**

This claim is another spin-out from Plaintiffs' flawed assignment theory and, like the unjust enrichment claim, is ill-defined and misplaced.   As Judge Hollander has written:

> A claim for "detrimental reliance," sometimes called "promissory estoppel," has four elements: (1) "a clear and definite promise" which (2) "the promisor has a reasonable expectation ... will induce action or forbearance on the part of the promisee" and (3) "which does induce actual and reasonable action or forbearance by the promisee," (4) causing "a detriment which can only be avoided by the enforcement of the promise."

*200 N. Gilmor, LLC v. Cap. One, Nat'l Ass'n*, 863 F.Supp.2d 480, 490 (D.Md. 2012) (quoting *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.,* 342 Md. 143, 166 (1996)).

Plaintiffs' allegations under this claim, as elsewhere, attack the Defendants' "purported power of sale, or power to foreclose" and cite to a failure to perfect a security interest or

14

to have "an equitable right to foreclose." (ECF No. 2, ¶ 52). Such allegations do little to further a detrimental reliance claim. The complaint states: "Plaintiff detrimentally relied and had reasonable reliance on the servicer to grant him a modification and made numerous attempts only to be turned down time and time again for unreasonable reasons." (*Id.*, ¶ 63). Defendants counter that "it is not entirely clear what promise from the Defendants Plaintiffs allegedly relied on to their detriment." (ECF 9-1, at 16).

Nowhere does the complaint set out where SPS, U.S. Bank, the DOT or the Note promised that a loan modification would be forthcoming, or even possible, such that Plaintiffs could reasonably rely on any expectation that SPS would modify the loan. Even by Plaintiffs' own telling, SPS stated multiple times that such a modification was simply "not an option on this loan." (ECF No. 2, ¶ 22). Plaintiffs fail to allege the first two elements of this claim, and their claims will be dismissed.

### E.   Quiet Title

Granting the Plaintiffs' *pro se* complaint the proper liberal interpretation, Defendants identify an "unnumbered" Count 5 that appears to be a quiet title action. Plaintiffs argue that Defendants' claims "constitute a cloud on Plaintiff's title," but they do not have a "perfected and secured claim" to the property. As such, "Plaintiff requests the decree permanently enjoin

15

Defendants . . . from asserting any adverse claim to Plaintiff's title to the property." (*Id.*, ¶¶ 80-82).

Maryland law clearly precludes a quiet title action against a mortgagee's adverse claim on a property (a "cloud" on title) by the mortgagor when he has not satisfied his loan obligations. Dismissing a highly similar *pro se* quiet title claim, Judge Hazel wrote:

> Here, Plaintiffs' action to quiet title must be dismissed because they do not have legal title to the Property. Indeed, Plaintiffs readily admit that they received a mortgage for the Property and conveyed the deed of trust. Plaintiffs have not alleged, nor have they demonstrated, that they have satisfied their obligations under the Note or the deed of Trust. Nor have Plaintiffs shown any right to [rescission] . . . . Nor is the Court moved by the fact that the deed of trust or the Note may have been reassigned. In signing the deed of trust, Plaintiffs acknowledged that the Note, as well as the deed of trust, could be transferred. The Court must therefore dismiss Plaintiffs['] quiet title action.

*De Silva v. Am. Brokers Conducit*, No. GJH-14-03462, 2015 WL 275769, at *3 (D.Md. Jan. 21, 2016) (collecting cases) (citations omitted); *see also Anand v. Ocwen Loan Servicing, LLC.*, 754 F.3d 195 (4th Cir. 2014) (finding plaintiffs "cannot[,] plausibly allege that they own legal title to the property" having signed a DOT to secure a home loan and having defaulted on that loan). Insofar as Plaintiffs mean to bring a quite title action, it will be dismissed as Plaintiffs have no legal right to bring such a claim.

**F.    Slander of Title**

Plaintiffs' slander of title claim is founded on the same theory as the previous claim.  Moreover, much of the language seems entirely lifted from another recent case decided by Judge Hazel or taken from a common source (i.e. "internet-sourced form pleading," as Defendants claim, ECF No. 9-1, at 4).   Judge Hazel wrote, "Plaintiffs [] assert a claim of slander of title.   This count makes largely unintelligible allegations about missing statements relating to perfection of security interests, which Plaintiffs assert 'remain unrecorded as "Secret Liens.'"   *Abgro v. Am. Partners Bank*, No.: GJH-19-1606, 2020 WL 1491343, at *9 (D.Md. March 27, 2020) (quoting the plaintiff's complaint) (*Cf.* ECF No. 2, ¶ 88) (making the same allegations)

"To support a claim for slander of title, a plaintiff must plead facts sufficient to show (1) a false statement, (2) that the false statement was communicated to someone else (publication), (3) malice, and (4) special damages." *Rounds v. Md.-Nat'l Cap. Park & Plan. Comm'n.*, 441 Md. 621, 663 (2015).  Granting a motion to dismiss another similar *pro se* complaint, Chief Judge Bredar stated: "Plaintiff here cannot establish that Defendants published a 'known falsity' because (1) the Deed expressly authorizes foreclosure actions and (2) Plaintiff never disputes that his mortgage payments were in arrears." *Parker*, 179 F.Supp.3d at 519.

Plaintiffs claim that the "act of recording the purported U.S. Bank, N.A. Assignment of Deed of Trust" in the Recorder's Office "is a communication of false statement derogatory to Plaintiffs' title." *Cf id.* (finding a foreclosure action was not a "known falsity").  As in *Parker*, Plaintiffs attach a DOT that expressly allows for assignment, and refer to the Note, which does the same.  (ECF No. 2-2); (*See* ECF No. 9-4).  Plaintiffs have not alleged plausibly that the recordation of such an assignment, shown to be valid in an unopposed instrument (ECF No. 9-7), is a false statement.  This claim will be dismissed.

**G.   Fraud**

Claims of fraud are subject to a heightened pleading standard. *See* Fed.R.Civ.P. 9(b).  This court recently explained:

> Rule 9(b) provides that, "in alleging a fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake.  Malice, intent, knowledge and other conditions of a person's mind may be alleged generally."  The circumstances required to be pleaded with particularity "include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'" . . . . Fraud allegations that fail to comply with Fed.R.Civ.P. 9(b) warrant dismissal under Fed.R.Civ.P. 12(b)(6) review.

*Van Buren v. Walmart, Inc.*, No. DKC 19-0911, 2020 WL 1064823, at *2 (D.Md. Mar. 5, 2020) (quoting *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F.Supp.2d 298, 313-14 (D.Md. 2000)).

18

**1.   Fraud in the Concealment**

Plaintiffs point to the purported securitization of the Loan as a concealed fraud perpetuated against them.  (ECF No. 2, ¶ 93). "Changing the character of the loan in this way," they argue, "had a materially negative effect on Plaintiff that was known by Defendant but not disclosed."  (*Id.*, ¶ 94).

The Court of Appeals of Maryland has stated:

> The essential elements for a claim of fraudulent concealment include:
>
> > (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Lloyd v. Gen. Motors Corp*, 397 Md. 108, 138 (2007) (quoting *Green v H & R Block*, 355 Md. 488, 525 (1999)).

As noted by Defendants, Plaintiffs' allegations contain boilerplate language and broad allegations in which "Defendants" are interchangeable and thus fail to meet the stricter pleading requirements of Fed.R.Civ.P. 9(b).[9]  (ECF No. 9-1, at 21) (citing

---

[9] Defendants also argue that any purported misrepresentation would have occurred when the Gales secured the mortgage in 2004, and so any fraud claims are time-barred by the applicable three-year statute of limitations.  (ECF No. 9-1, at 21); *see Giannasca v. Bank of Am., N.A.*, No. ELH-17-2110, 2018 WL 6046814, at *15 (D.Md. Nov. 19, 2018) (citing, among others, *Poole v. Coakley v.*

*Somarriba v. Greenpoint Mortg. Fund., Inc.*, No. 13-CV-072-RWT, 2013 WL 5308286, at *4 (D.Md. Sept. 19, 2013) ("Plaintiffs failed to plead particularized facts, such as the time, place, and contents of any false representations or the identities of the wrongdoers in support of" their fraud claims)).  Plaintiffs only point, in conclusory fashion, to "misrepresentations and improper disclosures" on which they purport to have relied reasonably to their detriment. (*See* ECF No. 2, ¶¶ 96-97).  Without pointing to specific instances in which a particular Defendant had a duty to disclose the purported securitization of the Note and yet intentionally concealed it, Plaintiffs' fraudulent concealment claim may not proceed and it will be dismissed.[10]

---

*Williams Const., Inc.*, 423 Md. 91, 131 (2011) ("Under Maryland law, the limitations period for a civil action is three years from the date the claim accrues.  C.J. §5-101.  This is true of claims of fraud and deceit . . . . An action typically accrues at the time of the wrong.")).  But the complaint shows uncertainty around the timing of the purported misrepresentations that culminated in the foreclosure action. (*See* ECF No. 9-1, at 21-22).  After all, U.S. Bank does not purport to have been assigned the Note/Deed until 2019, and claims it did not have SPS, as "attorney-in-fact," substitute the trustees (as per the DOT) until January 21, 2020. (*Id.*, at 5) (*See* ECF No. 9-7, at 2).  The only claims clearly time-barred then are those "predicated on origination of the Loan" itself, as Defendants concede.  (ECF No. 9-1, at 21).

[10] Any amendment to this claim would be futile under Fed.R.Civ.P. 15(a) as the caselaw discussed above clearly establishes that, as per the language of the Note and the DOT, there is no general duty to inform a borrower of the assignment or securitization of those instruments.

2.   **Fraud in the Inducement**

Plaintiffs' fraud in the inducement claim similarly fails to be pled with the particularity required by Fed.R.Civ.P. 9(b). Plaintiffs allege that "Defendants intentionally misrepresented [they] were entitled to exercise the power of sale provision contained in the Mortgage/Deed of Trust." Similarly, they allegedly "misrepresented that they are the 'holder and owner' of the Note and the beneficiary of the Mortgage/Deed of Trust." (ECF No. 2, ¶¶ 106-108). "[T]his was not true" as "[d]ocuments state that the original lender allegedly sold the mortgage loan to U.S. Bank, N.A. Pass-Through Certificates, Series 2006-AR18 Trust, as the purported assignee of Washington Mutual Bank."[11] (*Id.*, ¶ 109). Defendants allegedly "were attempting to collect on a debt to which they have no legal, equitable, or pecuniary interest" and are guilty of "fraudulently foreclosing." (ECF No. 2, ¶ 110, 112).

Alternatively labeled "fraudulent inducement of contract," Judge Bennett has explained:

>           The elements of a claim for fraudulent
>           inducement include:

---

[11]   Plaintiffs claim that Washington Mutual Bank was the "Originator on the contract" that sold the loan to this separate trust established by U.S. Bank, but this belies their earlier claim that the "original lender" on the Note was Mortgage One Corp. Although this purported bank appears throughout Plaintiffs' complaint, moreover, it does not appear in the DOT, the Note or in any of the assignments attached by Defendants. Plaintiffs seem also to allege fraud by U.S. Bank and a "Litton Loan Servicer" against a "deceased family member" of Mrs. Gale, but this claim has no relevance here.

> (1) that the defendant made a false
> representation to the plaintiff;
> (2) that its falsity was either
> known to the defendant or that the
> representation was made with
> reckless indifference as to its
> truth; (3) that the
> misrepresentation was made for the
> purpose of defrauding the
> plaintiff; (4) that the plaintiff
> relied on the misrepresentation and
> had the right to rely on it; and (5)
> that the plaintiff suffered
> compensable injury resulting from
> the misrepresentation.

*ATS Int'l Servs., Inc. v. Kousa Int'l., LLC*, No. RDB-12-2525, 2014 WL 1407290, at *4-*5 (D.Md. April 10, 2014) (quoting *Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Group, Inc.*, 299 F.Supp.2d 505, 525 (D.Md. 2004)).

This allegation is only somewhat less threadbare. Plaintiffs' reliance on Defendants' authority as owner of the Note is implicit in Plaintiffs' purported payments on the Loan and their attempt to modify it with SPS. When exactly either Defendant is said to have represented it had rights in the Note, however, is entirely unclear. Moreover, Plaintiffs fail to produce or clarify which "Documents" can establish that the entity they allege to be the actual owner of the note is the rightful one or what, if any, corporate affiliation such an entity has with Defendants. Even presuming Plaintiffs were misled as to the true owner the Note, it is unclear what "compensable injury" they suffered as a result. In arrears, foreclosure was imminent for the Gales, regardless of

who sought their payments.  Plaintiffs have not stated this claim
with the required particularity.  This claim will be dismissed.[12]

### H. "Unconscionable Contract"

Plaintiffs claim they were "forced, tricked, and mislead into
parting with [their] property" and thus the terms of the Loan were
unconscionable. (ECF No. 2, ¶ 121).  While the allegations border
on the nonsensical, they seem to surround a purported secret side-
bargain between U.S. Bank and a third-party that allowed them to
profit by closing on the property using a "warehouse line of
credit." (*Id.*, 125).  Unlike the fraud claims, Plaintiffs
explicitly peg this claim to informational and power asymmetries
occurring between parties as they negotiated over the "origination
of the purported loan." (ECF No. 2, ¶ 123-24).[13]

In either a typographical error or a misreading of the
complaint, Defendants claim "there is not cause of action [sic]
under Maryland law known as 'unconscionable conduct.'" (ECF No.

---

[12] Amendment is futile on this claim also as Defendants have
produced unopposed records of assignments that belie the
plausibility of any claim that Defendants collected payments on
the loan or initiated foreclosure knowing, or with reckless
indifference, to the truth.  Even if Defendants ultimately had no
such rights, Defendants U.S. Bank and SPS, as the "servicer" of
the Loan, cannot plausibly have acted with the kind of
intentionality required of this claim because it was reasonably
relying on an executed assignment that purports to show them as
the rightful owner/holder of the DOT.

[13] This renders the allegations against "U.S. Bank, N.A."
nonsensical as both the DOT, the Note, and even Plaintiffs'
allegations elsewhere make clear that U.S. Bank was not actually
a party to the original loan.

9-1, at 22).   Nonetheless, rightfully confused as to what Plaintiffs are alleging, Defendants assert that these allegations are "well-outside the three-year limitations period," even if they have "provided grounds for actionable fraud."  (ECF No. 9-1, at 22).

"Under Maryland law, an unconscionable contract is void." *Aerotek, Inc. v. Obercian*, 377 F.Supp.3d 539, 553 (D.Md. 2019) (citing *Walther v. Sovereign Bank*, 386 Md. 412 (2005)).   A plaintiff must show both substantive and procedural unconscionability.  The former is shown by "contractual terms that unreasonably favor the other party," and the latter is shown by "one party's lack of meaningful choice" (i.e. a "contract of adhesion").  *Id.* (citing *Walther*, 386 Md. at 424-426).

Assuming for argument's sake that Defendants are the proper party and the claim is timely, Plaintiffs have not provided allegations to which Defendants can reasonably respond.  While Plaintiffs make conclusory assertions that they were the victim of "Unequal Bargaining Power" and "Unfair Surprise," among other things, they point to no specific clause or term of either the DOT or the Note that they claim is unconscionable.  Their claims of power and informational asymmetries lack any specificity, and it is equally unclear what funding mechanism Plaintiffs are describing or why it is evidence of unconscionability of the DOT or the Note.  Lastly, the remedy the Plaintiffs are seeking is not

clear, either, particularly as voiding of the entire loan would mean they would have to return the loan proceeds.

Any amendment to correct these deficiencies would be futile, moreover. Fed.R.Civ.P. 15(a). Unconscionability is rarely viable as the claim sets a high bar. "[T]raditionally, a bargain was said to be unconscionable in an action at law if it was 'such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *Falls v. 1CI*, 208 Md.App. 643, 664 (2012); *Walther*, 386 Md. at 426 ("An unconscionable bargain or contract has been defined as one characterized by 'extreme unfairness'") (citing Restatement (Second) of Contracts § 208)). Even if their allegations are accepted as true, Plaintiffs cannot plausibly show they were subject to the kind of "extreme unfairness" this claim requires. The claim will be dismissed with prejudice.

## I.   Breach of Contract

Plaintiffs also bring a breach of contract claim, not under the purported PSA, but under the terms of the DOT. Plaintiffs allege that Defendant U.S. Bank was required under paragraph twenty-three to "satisfy, release and reconvey the beneficial security interest in Plaintiffs' pledged Deed of Trust upon payment of all sums associated with the release premium to U.S. Bank, N.A. for . . . . services rendered." Defendants are right that this argument, although highly confusing, seems to suggest that when

they allegedly securitized the property, Defendants were "paid," and this clause was triggered.  But such payments do not affect Plaintiffs' obligation to pay the loan, as discussed above.  (*See also* ECF 9-1, at 23).  The release refers only to the release of the Borrower from his or her obligations "[u]pon payment of all sums secured by this Security Instrument, Lender or Trustee." (ECF No. 2-2, ¶ 23).  Read in the full context of the DOT, the payment "secured" is clearly meant to refer to the Borrower's debt payments and not any separate profit from investors secured by selling off derivative rights of the property.   This claim will be dismissed.

**J.    CCPA/TILA**

Plaintiffs' purport to bring a claim under the CCPA, but cite to "15 USC Chapter 41 § 1461(g)," while including the statutory text for 15 U.S.C. § 1641(g). (ECF No. 2, ¶ 135).  Section 1641(g), however, is a portion of the Truth in Lending Act ("TILA"), not the CCPA, as Defendants point out.   (ECF No. 9-1, at 24). Regardless, Plaintiffs imply this code section requires notice to a borrower within thirty days whenever the Loan is "sold or otherwise transferred or assigned to a third party." (ECF No. 2, ¶ 135).  "Defendants violated the [TILA] by failing refusing [sic] to disclose the purported assignments/transfer of the Promissory Note and DOT."  (*Id.*, ¶ 137).  They request "actual and statutory damages" as a result.  (*Id.*).

Judge Bennett has explained the statutory requirement:

> [N]ot later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the *creditor* that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including—
>
> (A) the identity, address, telephone number of the new creditor;
> (B) the date of transfer;
> (C) how to reach an agent or party having authority to act on behalf of the new creditor;
> (D) the location of the place where transfer of ownership of the debt is recorded; and
> (E) any other relevant information regarding the new creditor.

*Barr v. Flagstar Bank, F.S.B.*, No. RDB-13-2654, 2014 WL 4660799, at *3 (D.Md. Sept. 17, 2014) (emphasis added).

Defendants assert that U.S. Bank did not need to give such notice because the requirements apply to the transfer of debt and not the actual instrument securing the repayment of that debt (*i.e.* the DOT).  (ECF No. 9-1, at 26).

The merits of this argument need not be addressed.  While Plaintiffs *might* be able to state facts sufficient to give rise to a plausible TILA claim, they have failed to do so here.  It is far from clear that Plaintiffs even intend to bring such a claim by citing to the CCPA instead.  More fundamentally, Plaintiffs' claim generically attacks the "purported assignments/transfer of the Promissory Note and DOT," but fails to identify *which* assignment, or when it occurred.  Defendants' attempts to fill in the blanks

do not save this claim.   Plaintiffs will be given twenty-one days in which to amend their complaint if they wish to assert a TILA claim with more particularity.

Such amendment is futile insofar as it attempts to include any purported claims against SPS under this count, however. Fed.R.Civ.P. 15(a).  The statute states clearly that only "the creditor that is the new owner" is required to give such notice. Defendants assert that SPS is a simple loan servicer ("it collects Loan payments[] and administers that debt") as Plaintiffs recognize in their complaint. (ECF No. 9-1. at 25) (citing ECF No. 2, ¶ 5).  SPS cannot be considered a "new creditor" under a purported assignment and may not be included as a named Defendant under this claim if amended.

**K.   Regulation X and the Loan Modification Application**

Plaintiffs' "Twelfth" claim for relief asserts that Defendants violated Regulation X of the Federal Regulation. 12 C.F.R. § 1024.41(b)(2)(i)(A).

Regulation X grants a private right of action to enforce the Real Estate Settlement Procedures Act ("RESPA"), which itself "regulates the servicing of mortgage loans." *Hahn v. Select Portfolio Servicing, Inc.*, 424 F.Supp.3d 614, 624 (N.D. Cal. 2020) (citing 12 U.S.C. § 2605).  Sub-section (b)(2)(i) lays out the procedures that a servicer must follow when reviewing any "loss mitigation application." § 1024.41(b)(2)(i).  The rule applies to

a "servicer" and requires that it "[p]romptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete." § 1024.41(b)(2)(i)(A).   Within five business days of receiving the application, the servicer must both acknowledge receipt of it and let the borrower know if it is complete or incomplete.   If incomplete, the notice must state the missing information and documents necessary to make it complete, along with "a reasonable date by which the borrower should submit [those] documents and information." § 1024.41(b)(2)(i)(B), 2(ii).

A Plaintiff must also establish damages.   In order to recover statutory damages, a plaintiff is required to show "a pattern or practice of noncompliance."   12 U.S.C. § 1605(f)(1); *see also Sutton v. CitiMortgage, Inc*, 228 F.Supp.3d 254, 264-65 (S.D.N.Y. 2017) ("Pattern or practice means a standard or routine way of operation . . . . Though there is no set number of violations needed to plead a pattern or practice of noncompliance") (internal quotation marks omitted).   In the absence of a pattern or practice of violations, a plaintiff must show actual damages – economic harm arising directly from the alleged violation.   *Reynolds v. Ward*, No. TDC-18-3921, 2019 WL 3779755, at *6 (citing *Aghazu v. Severn Sav. Bank*, No. PJM 15-1529, 2016 WL 808823, at *19 (D.Md. Mar. 2, 2016) (collecting cases)).

29

Plaintiffs recite boilerplate language and argue that Defendants did not provide virtually every type of notice required under this regulation. The complaint does not say, however, whether their application(s) were ever deemed incomplete, a predicate to any violation of the follow-up requirements. In fact, both modification requests highlighted by Plaintiffs apparently were deemed complete based on Plaintiffs' allegations of their review and denial (with SPS expressly notifying Plaintiffs that their initial application was complete prior to its denial, by Plaintiffs' own admission). (ECF No. 2, ¶ 22).

Defendants are correct that plaintiffs do not *explicitly* state "if and when they submitted a loss mitigation application," or whether it was "at least 45 days before a foreclosure" to trigger the notice requirements (ECF No. 9-1, at 28). But much of this information can be easily gleaned from the complaint's general (incorporated) allegations and publicly accessibly information.

A loss mitigation application is defined simply as "an oral or written request for loss mitigation" accompanied by "information required by a servicer for evaluation for a loss mitigation option." § 1024.31. Therefore, both of Plaintiffs' requests to SPS for a "modification" are properly treated as loss mitigation applications. The complaint also shows that the "NOTE[n]," presumably referencing the Note with a modification request, was submitted to SPS on September 19, 2019, and, on

30

September 26 the "File [was] marked as complete . . . and has been sent to the UW [underwriter] for review." An early October entry by Plaintiffs shows that their request was denied, as SPS declared that modification was not even an "option" on this loan. (ECF No. 2, ¶ 22). A week after resubmitting on November 18, the second request is shown denied on the same grounds. The state docket states that the Substitute Trustee subsequently initiated the foreclosure proceeding on March 19, 2020. Such statements are enough to state plausibly that the requirements of Regulation X were triggered by Plaintiffs' requests for loan modification.

Nevertheless, Defendants are correct that "Plaintiffs do not allege any actual damages as a consequence of Defendants' supposed RESPA violation, nor a pattern or practice of noncompliance with RESPA." (ECF No. 9-1, at 28). Plaintiffs only explicitly point to two, back-to-back denials of their loan modification requests. Two instances with a single client cannot plausibly constitute a routine way of operating that establishes a "pattern or practice." Nor do Plaintiffs establish any direct damages resulting from these alleged regulatory failings. Plaintiffs have failed to connect any alleged failure to notify them concerning their loan modification applications with the eventual foreclosure. How such notices would have prevented the foreclosure, or even denial of a loan modification is entirely unclear, even presuming that the alleged seven-day gap shown between the submission of these

applications and SPS's responses constituted a violation.  This claim will be dismissed without prejudice.  Plaintiffs will be given twenty-one days in which to amend their complaint if they wish to assert a Regulation X claim with more particularity.

**L.   Intentional and Negligent Infliction of Emotional Distress**

Although pled as a single claim, these two torts form two separate causes of action.  Nonetheless, Plaintiffs plead allegations purportedly central to both.  They complain of the "last several years of litigation," during which "Plaintiff [presumably Mr. Gale] has had to undergo four surgeries for his heart and has had to seek therapy for depression" and that both Gales have "suffered personal injury" and had "numerous doctor's visits" around a "variety of illnesses."  Plaintiffs also allege that the "collection scheme has caused the Plaintiff emotional distress." (ECF No. 2, ¶¶ 155-58).  How the physical injuries and sickness that the Gales suffered can be attributed to either SPS or U.S. Bank is unclear.  Regardless, these allegations do not rise to a cognizable claim under either standard.

The claim for negligent infliction of emotional distress fails outright as "Maryland does not recognize an independent tort for negligent infliction of emotional distress." *Miller v. Bristol-Myers Squibb Co.*, 121 F.Supp.2d 831, 839 (D.Md. 2000); *see also Lapides v. Trabbic*, 134 Md. App. 51, 66 (2000) ("Because Maryland does not recognize the separate and distinct tort of

negligent inflection of emotional distress, the lower court properly granted appellee's motion to dismiss.").

An independent claim for intentional infliction of emotional distress (IIED) is recognized under Maryland law, but Plaintiffs have not stated facts sufficient to form a plausible claim. As set out by Court of Appeals of Maryland, the elements of this claim are that the conduct must be: 1) "intentional or reckless"; 2) "extreme and outrageous"; 3) causally connected to emotional distress; and that distress 4) "must be severe." *Harris v. Jones*, 281 Md. 560, 566 (1977). Having reviewed subsequent caselaw, Judge Harvey wrote that "[t]he tort of [IIED] is rarely viable" as "Maryland courts have established a high standard of culpability before conduct can be considered 'extreme and outrageous.'" *Farasat v. Paulikas*, 32 F.Supp.2d 244, 247 (D.Md. 1997) (citing *Bagwell v. Peninsula Reg. Med. Ctr.*, 106 Md. App. 470, 514 (1995), *cert. denied*, 341 Md. 172 (1996) and *Harris*, 281 Md. at 566-72).

Even if this conduct could be viewed as severe, there is no way that it plausibly rises to the level of "extreme and outrageous." Amendment would be futile, moreover, as it is hard even to imagine a dispute over loan modification, assignment or even foreclosure could ever rise to the level required by this claim. Fed.R.Civ.P. 15(a). *See Parker*, 170 F.Supp.2d at 518 ("Rather than pleading actionably extreme misconduct and specific manifestations of distress flowing from that misconduct, Plaintiff

has pleaded run-of-the-mill borrower/lender claims and conclusory damages."). This claim will be dismissed.

The declaratory relief sought under the "fourteenth count" is not a cause of action at all but rather a prayer for relief, as Defendants correctly argue, and so it need not be addressed (ECF No. 9-1, at 31), particularly with all underlying claims dismissed.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendants will be granted. A separate order will follow.

                                        /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge